UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| Tania Corfey and Sabrina Corfey, | |
|---|---|
| *Plaintiffs*, | Civil No. 3:09cv858 (JBA) |
| v. | |
| Rainbow Diner of Danbury, d/b/a/ Three Brothers Diner, et al. | October 15, 2010 |
| *Defendant.* | |

RULING ON MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs Tania Corfey ("Tania") and Sabrina Corfey ("Sabrina") bring suit against the Rainbow Diner of Danbury, doing business as the Three Brothers Diner ("Three Brothers"), its owner Nick Kallivrousis ("Nick"), and his wife Teresa Kallivrousis ("Teresa"), alleging sexual harassment in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60(a)(8) (Count One) and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Count Two); and retaliation in violation of Conn. Gen. Stat. § 46a-60(a)(4) (Count Three) and 42 U.S.C. § 2000e–3 (Count Four). Defendants move for partial summary judgment on Counts Three and Four in Tania's Complaint against Three Brothers, alleging retaliation, and Counts Two, Three, and Four in Tania and Sabrina's Complaint against the individual Defendants, because Title VII does not recognize claims against individuals. For the following reasons, Defendants' Motion for Summary Judgment will be denied for Counts Three and Four as to Three Brothers, Count Three as to Nick and Teresa Kallivrousis, and granted absent objection for Counts Two and Four as to the individual Defendants.

I. Factual Background

Three Brothers has operated in Danbury, Connecticut since 1979. It is open 24 hours a day and seven days a week and is owned by Defendant Nick, who serves as its President and manages it with assistance from his wife Teresa, who is not a paid employee. (Nick Kallivrousis Dep., Ex. 2 to Defs.' Loc. R. 56(a)1 Stmt. [Doc. # 36] at 8:25–9:1, 10:14–22.) Teresa, who owns a real estate business located next door to Three Brothers, ate dinner at Three Brother "every night" with Nick during 2006 and 2007. (Teresa Kallivrousis Aff., Ex. 1 to Defs.' Loc. R. 56(a)1 Stmt. at ¶ 4.) Three Brothers does not provide sexual harassment training to its employees, but it does display an informational poster on sexual harassment. (Nick Kallivrousis Dep. at 27:12–20.)

In May 2006, Tania Corfey ("Tania"), who had previous waitress experience (*see* Tania Corfey Dep., Ex 4 to Defs.' Loc. R. 56(a)1 Stmt., Ex. 1 to Pls.' Obj. [Doc. # 39] at 65:13–16), was hired as a waitress at Three Brothers. (*Id.* at 67:10–13.) She initially worked seven days a week, "sixty hours [a week] for a while" (*id.* at 188:24–189:3), and was supervised by "Michael," who began his shifts at 9 p.m. and by Nick and Teresa earlier in the evening and during the day. (*Id.* at 88:8–22.) When Tania first started working at Three Brothers, she lived in Waterbury, and because of transportation difficulties, she would often not arrive there until 6 p.m., even though her shift began at 5 p.m., while other staff would arrive at 5 or 5:30 p.m. (*Id.* at 116:10–24.)

When Tania began working at Three Brothers, three waitresses, Monica, Carmen, and Claudette had worked there for about five years, as had a waiter named Jose, who was on a leave of absence. When Tania started her job, she began work in Jose's section at the front of the dining room. (*Id.* at 75:13–76–6.) When Jose returned, Tania was assigned to

2

work "[u]sually in the middle" of the dining room (*id.* at 78:21–79:1), while Jose would work in the most lucrative section of the dining room, "the Wall," which had three big booths (*id.* at 81:10–22.) Tania viewed the "strongest" waiters to be Carmen and Jose, then Monica, and then her. (*Id.* at 120:21–121:4.) Other waitresses, such as "Jackie" who began working at Three Brothers after Tania were less "strong."

When Tania began working at Three Brothers, Teresa made the section–assignment decisions, and Jose, Monica, and Carmen, as the "longer term employees" had the "preferential sections at all times." (*Id.* at 109:17–109:6.) Because Tania and other newer employees felt that the section–assignments by Teresa were "not fair," they asked Teresa if they could determine their own sections. (*Id.* at 109:5–22.) Teresa agreed and subsequently allowed members of the wait staff to decide among themselves who would cover which section. (*Id.* at 113:22–115:21.) Those decisions were made at the beginning of each shift, and because Tania would arrive to work late, she was often assigned the "counter," one of the worst sections, having missed the opportunity to claim a better section. (*Id.* at 116:3–8.) By Spring 2007, when Tania's transportation problems were resolved, and she was consistently on time, she worked in the larger, more profitable sections of the Diner. (Tania Corfey Aff. at ¶ 9.) The wait staff would use a variety of methods to determine section assignments, including drawing numbers or an informal rotation system. (*Id.* at 118:17–119:13.) Occasionally, Michael would intervene if he felt that waitresses, such as Jackie, were assigned to sections they were not capable of handling, such as the Wall (*id.* at 119:16–120:8), or Nick and Teresa would reassign people they thought were unable to handle busy sections. (*Id.* at 122:4–12.) Teresa disputes that she ever reassigned sections for waitresses because those decisions are made daily before she arrives at the diner. (Teresa

3

Kallivrousis Dep. at 19:9–17.) Tania was initially "put . . . in a big section," and in the beginning was never reassigned to less busy sections. (Tania Corfey Dep. at 123:3–7.) Although Tania would regularly take smoke breaks during slow periods in her shifts (*id.* at 90:15–91:13), which occasionally upset Nick, who would "yell, if . . . he saw something wrong at [her] table and [she] was outside having a cigarette" (*id.* at 96:16–24), she was never formally disciplined by Nick or Teresa (Teresa Dep. at 25:18–20).

At some point after Tania began working at Three Brothers, her daughter Sabrina, then 18 years old, was hired by Three Brothers to bus tables. (Tania Corfey Aff. at ¶ 10.) In late Spring or early Summer 2007, Sabrina began training to waitress at Three Brothers and began working in a waitress position. (*Id.* at ¶ 11.) Sabrina worked exclusively at the slowest section of the diner, because of her inexperience. (*Id.* at ¶ 12.) While Sabrina trained, and for a while after she began working as a waitress, Tania would be assigned to smaller sections, near the counter section in order to watch over her. (*Id.* at ¶ 13.) By August 2007, Sabrina "could handle waitressing at the counter section without supervision and during the summer, there were in fact times when Sabrina worked a waitressing shift when [Tania] was not working." (*Id.* at ¶ 14.)

Tania maintains that beginning in Spring 2007, a cook Alberto Perez began making sexually explicit, obscene comments to her and her daughter. (Tania Corfey Aff. at ¶ 5.) According to Sabrina, Perez began with his inappropriate comments shortly after she began working at Three Brothers: "He was always making sexual remarks or turning everything he could into a sexual innuendo." (Sabrina Corfey Dep. at 49:9–22.) On average, Sabrina says that Perez would make three inappropriate sexual comments per shift, and when she would

4

tell him to stop, he would "laugh about it" or would "mess[] up [her] orders or . . . just . . . give [her] a hard time." (*Id.* at 50:5–18.) Even though Perez's comments "would really stress [Sabrina] out," she "still had to get the job done because [she] needed the hours." (*Id.* at 52:6–10.) According to Sabrina, Perez's comments distracted her and caused her performance to suffer because she "was just trying to do [her] job and all he could think about was sex." (*Id.* at 53:2–5.) The frequency of the comments directed towards Sabrina increased after she began working as a waitress, because "as a bus person, [she] didn't have to talk to him as much." (*Id.* at 53:9–18.) The "rest of the kitchen staff would laugh" at Perez's comments. (*Id.* at 54:22–24.)

According to Jessica Flores–Adams, who began waitressing at Three Brothers after Tania but before Sabrina, and had at one point dated Perez, Perez would make sexually charged comments to "[p]retty much any female employee," including both Tania and Sabrina. (Flores–Adams Dep., Ex. 4 to Pls.' Loc. R. 56(a)2 Stmt., at 13:19–14:5.) Flores–Adams witnessed Perez making such comments "[a]t least three to four times a night. If not more often than that." (*Id.* at 17:13–18.) At least one of those comments a night would be directed at Sabrina. (*Id.* at 17:19–24.) Flores–Adams would witness Michael, the supervisor, "laughing" and "snicker[ing]" at Perez's sexual comments. (*Id.* at 22:15–23:1.) Flores–Adams was also present in the kitchen on occasion with Nick and Teresa when Perez would make sexual comments. (*Id.* at 23:15–25.) Flores–Adams witnessed Sabrina "get

5

". . . pissed off" and respond to Perez's comments by "throw[ing] . . . dishes into the dish bin." (*Id.* at 40:10–16.)

Danbury police officer Daniel Sellner, who regularly worked late–night shifts near the Three Brothers diner and would frequent it, heard a cook on more than one occasion make "playful" "sexual comments" to Sabrina that she responded to negatively. (Sellner Dep., Ex. 3 to Pls.' Loc. R. 56(a)2 Stmt. at 24:4–19.) Officer Sellner heard the cook make comments about "her posterior," and it was Sellner's impression that "the cook was interested in, you know, sexual activity between himself and Sabrina." (*Id.* at 26:7–21.) Those comments were "usually rebuffed by Sabrina," who would say "things like shut up or you're a pig." (*Id.* at 27:13–21.) Sellner says that the cook's sexual comments were a "somewhat common occurrence." (*Id.* at 30:1–6.) Sellner advised Sabrina to speak to her employer, and Sabrina responded that she was "unsatisfied with her employer's response," so Sellner told her she should contact a lawyer. (*Id.* at 33:12–34:1.)

Out of concern that Sabrina had to work in a "sexually charged and inappropriate environment" (Tania Corfey Aff. at ¶ 10), Tania says she spoke to Teresa on August 11, 2007 about the sexual harassment "that had been going on in her restaurant" (*id.* at ¶ 11). According to Tania, Teresa, in turn, told Nick that Tania had complained about Perez's alleged harassment, and Nick initially responded by yelling at Sabrina in the kitchen and telling her that "if she 'didn't like the way that Alberto talks,' then she should 'call the cops.'" (*Id.* at ¶ 12.) Tania says that Nick then forced Tania into the kitchen to confront Perez, and

6

as a result, she "had a panic attack and had to go outside just to calm down." (*Id.* at ¶ 14.) When she returned, Nick and Teresa approached Tania and told her she was "being 'ridiculous,' to 'knock it off' and that Alberto 'was not some kind of monster.'" (*Id.* at ¶ 15.) The following day, when Tania returned to work, Nick asked "are you okay crybaby?" (*Id.* at ¶ 16.) Teresa approached Tania that day and informed her that Teresa "'could not make [Perez] stop'" and told Tania that she needed to have "'thicker skin.'"

Nick, however, denies ever having had a conversation with Tania or Sabrina Corfey about Alberto Perez. (Nick Kallivrousis Dep. at 47:25–48:16.) The only time that Nick says he heard a complaint from Tania about Perez was when Tania reported to him that Perez was not cooking the food that her patrons had ordered, which caused her to cry, in response to which Nick went into the kitchen and told Perez to give Tania the food that had been ordered. (*Id.* at 45:10–18.) Teresa also denies ever hearing Perez make offensive comments or being told about such comments by Tania. (Teresa Kallivrousis Dep. at 22:14–25.)

According to Tania, after she complained, Nick and Teresa took away one of her regular work shifts (Tania Corfey Aff. at ¶ 23) and reduced her hours during two of her other regular shifts (*id.* at ¶ 24). Tania also maintains that after complaining about Perez, she was regularly reassigned by Nick and Teresa from larger, more profitable sections of the diner to smaller, less profitable sections after she began working in the larger sections. (*Id.* at ¶ 25.) After she complained about Perez's comments, she was "not allowed to have any of the three sections in the dining room. Those are the three money sections." (Tania

7

Corfey Dep. at 164:23–165:3.) When it was her turn to rotate into the dining room, she was "pushed out, back out into the little room." (*Id.* at 165:4–8.) Additionally, after she complained, Tania says that her Thursday shift was "no longer until two a.m. It was to eleven. So, [she] lost the bar crowd." (*Id.* at 189:8–10.) On Sundays, her "shift used to be until two in the morning. It got cut to eleven o'clock." (*Id.* at 189:11–13.) Sabrina reported to Officer Sellner that after the complaints of sexual harassment, she "had been put back on . . . busing tables some nights when [she] had been waitressing every night," and she told him "how they were messing up [her] food orders in the kitchen." (Sabrina Corfey Dep., Ex. 6 to Defs.' Local R. 56(a)1 Stmt. at 41:6–14.) Additionally, Tania says that after she complained, neither Nick nor Teresa investigated her complaint, "nor did they make any attempt to stop Alberto Perez from continuing to make lewd and sexually explicit comments to [her] or [her] daughter," and Perez continued his sexually harassing behavior unabated. (Tania Corfey Aff. at ¶¶ 21, 22.)

In August 2007, Tania requested that Teresa give her August 26, August 31, and September 1–8, 2007 off. (Teresa Aff. at ¶ 5.) On September 7, 2007, after Carmen and Jose had recently resigned and several other waitresses had asked for time off, Three Brothers hired Erica Drummond as a waitress. (*Id.* at ¶ 7.) On September 13, 2007, Tania quit Three Brothers.

The night before Tania's last day at Three Brothers she worked with two new waitresses and her daughter, and the four of them agreed that the next day, Tania would

8

work the lucrative "Wall" section. Nonetheless, on September 13, Teresa reassigned Tania to the least profitable section, the front windows, near where her daughter was working. (Tania Corfey Dep. at 125:3–12.) Tania says that "Teresa claimed that [Tania] was being reassigned to 'babysit' Sabrina, who was waitressing at the counter section," but maintains that "[b]y that time, Sabrina was a competent waitress and did not require [her] supervision or [her] assistance." (Tania Corfey Aff. at ¶¶ 27, 28.)

That night, after Tania was reassigned to the front windows, she went into the kitchen, where Perez "was running his mouth again," making vulgar, obscene sexual comments (Tania Corfey Dep. at 167:21–168:2), and she could not "take it anymore" and quit (*Id.* at 168:2–4). Tania explains that when she quit, she was not interested in earning a better living; rather she says that it was "the fact of the crap [she] had to listen to and [she] had to go through every single day to try to earn a living. . . . [A]nd the owners of the . . . place had nothing to say but '[G]row thicker skin. He's not a monster.' Well you know what? Do you want your daughter talked to that way? I don't think so." (*Id.* at 192:1–15.)

On January 3, 2008, Tania filed a complaint against Three Brothers with the Connecticut Commission on Human Rights and Opportunities ("CHRO"). (CHRO Compl., Ex. 9 to Pls.' Loc. R. 56(a)2 Stmt., at 1.) After Tania filed the CHRO complaint, Nick, for the first time, asked Perez about the allegations, which Perez denied. (Nick Kallivrousis Dep. at 48:17–23.) Nick also asked "the girls, the cooks" and Michael if they knew of the conduct alleged by Tania, and Nick reports that no one he spoke with had heard about it. (*Id.* at

9

49:2–19.) The only Three Brothers employee with whom Teresa spoke after Tania filed her CHRO complaint was Michael, who said he was not familiar with the conduct Tania alleged. (Teresa Kallivrousis Dep. at 23:15–24:1.)

II. Discussion[1]

    A. Retaliation in Tania's Counts Three and Four

Defendants contend that Tania has failed to demonstrate that she was retaliated against for her complaints about Alberto Perez's comments. A *prima facie* retaliation claim requires evidence (1) that Plaintiffs engaged in protected activity, (2) that Defendants were aware of Plaintiffs' protected activity, (3) that Plaintiffs suffered an adverse employment action, and (4) that there was a causal connection between the protected activity and adverse action. *Kaytor v. Electric Boat Corp*, ---F. 3d----, 2010 WL 2593500, *15 (2d Cir. 2010).[2] If a plaintiff meets her minimal *prima facie* burden and the defendant sets forth its with legitimate non–discriminatory justifications for its actions, then the plaintiff must offer evidence sufficient for reasonable jurors to draw the inference that the proffered reasons are likely pretexts for retaliation. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1181 (2d Cir. 1996). Accepting as true for purposes of summary judgment Tania's statements that she

---

[1] The Court will apply the familiar summary–judgment standard without recitation in detail. Fed. R. Civ. P. 56(c)(2); *see, e.g.*, *Davis v. City of Hartford*, 601 F. Supp. 2d 488, 491 (D. Conn. 2009).

[2] Because federal law guides analysis of Connecticut's anti-discrimination statutes, *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 103 (1996), Plaintiffs' federal Title VII and CFEPA retaliation claims will be analyzed together.

complained, the first two elements of Plaintiffs' *prima facie* retaliation claim have been satisfied. Remaining is whether there is sufficient evidence in the record to support a reasonable inference that Tania suffered adverse employment actions that were causally linked to her complaints to Teresa of Perez's sexually inappropriate comments.[3] If so, Defendants contend that their actions were justified and that there is no evidence that they were only pretextual.

---

[3] Defendants do not explicitly challenge the existence of the fourth element of Plaintiffs' *prima facie case*, i.e., a causal link between protected activity and adverse employment actions. Whether Defendants' claim that Tania was relocated for legitimate reasons should be viewed as an attack on Plaintiffs' *prima facie* case or as a proffered legitimate reason for an employment action is not of significant consequence, "[b]ecause issues of this nature tend to collapse as a practical matter under the *McDonnell Douglas* framework," *Collins v. New York City Trans. Auth.*, 305 F.3d 113, 119 n.1 (2d Cir. 2002), and will be considered as supporting Defendants' purported legitimate, nondiscriminatory reason for assigning Tania to smaller sections of the diner. Even if the causation element of Tania's *prima facie* case was disputed, the proximity of the adverse employment actions alleged after the protected activity—Tania says she was prevented from working in profitable sections of the diner immediately after she complained to Teresa—is sufficient to demonstrate that element of the *prima facie case*. The Second Circuit has "consistently held that proof of causation can be shown . . . by showing that the protected activity was followed closely by discriminatory treatment." *Gordon v. New York City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *see also Cifra v. G.E. Co.*, 252 F.3d 205, 218 (2d Cir. 2001) (only three days elapsing between protected activity and adverse action could give rise to inference of retaliation).

i. *Adverse Employment Actions*[4]

Tania alleges two primary adverse employment actions: (1) Defendants scaling back the hours she worked in her shifts and (2) Defendants repeatedly reassigning her to small or slow sections of the diner from the more lucrative sections where she was already working. Employment actions are adverse for Title VII anti–retaliation purposes if they "would have been materially adverse to a reasonable employee or job applicant," meaning "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) (quoting *Burlington N. and Santa Fe R.R. Co. v. White*, 548 U.S. 53, 57 (2006). Defendants do not dispute that reductions in hours or potential tips would constitute adverse employment actions. Rather, Defendants argue that there is no evidence to support either of those alleged consequences or to link those alleged adverse actions with Tania's sexual harassment complaints to Teresa.

Defendants maintain that Tania regularly worked Wednesday through Sunday both before and after the protected activity. It is undisputed that Tania did voluntarily take off Labor Day and one other day. While Tania took off Labor Day and may have taken off another day, which might account for the diminution in total hours worked after her complaint about Perez's comments, she avers specifically that the end–time for her Thursday

---

[4] Defendants only argue that Tania has suffered no adverse employment action and do not discuss Sabrina.

and Sunday shifts was changed from 2 a.m. to 11 p.m., thus eliminating her profitable "bar crowd" hours. Neither the payroll logs nor the Three Diners scheduling calendars proffered by Defendants (Ex. 9 to Defs.' Loc. R. 56(a)2 Stmt) detail the specific hours worked for any given shift to rebut Tania's assertion that her shifts were cut by three lucrative hours on Thursday and Sunday nights. Therefore, whether her hours were reduced so as to constitute adverse action is a genuine issue of disputed material fact for a jury to decide.

Next, Defendants contend that "Tania has come forward with no evidence that she was assigned to allegedly 'slow' sections of the Diner after she purportedly complained to Teresa in August 2007." (Defs.' Mem. Supp. at 8.) Specifically, Defendants argue that the wait–staff selected their own sections; that a waitress could be reassigned from a busy section if she "was [not] skilled enough to handle a particular section"; and that on September 13, 2010, Tania was reassigned to the front window section so she would be near her daughter. Yet Tania contends that after she complained about Perez's comments, she was "not allowed to have any of the three sections in the dining room," the "money sections," and when it was her turn to rotate into the dining room, as agreed among the members of the wait–staff, she was "pushed out, back out into the little room" by Nick and Teresa. Tania further avers that she was reassigned to small, slow sections despite having demonstrated the capability to handle busier sections, having covered Jose's section during his absence and having regularly worked sections in the dining room after he returned before she complained to Teresa. And on the night of September 13, 2008, disputing Teresa's contention that Tania was reassigned

13

to the windows to watch over Sabrina, Tania avers that Sabrina had repeatedly waitressed on her own by that time, sometimes when Tania was not even working at the diner. Thus, Plaintiffs have provided sufficient evidence that Nick and Teresa repeatedly prevented Tania from working in larger, busier sections of the restaurant, from which a jury could infer that they took adverse employment actions against Tania.

Finally, Defendants claim that "[p]erhaps most importantly, Tania has not come forward with any evidence of her purported difficulty earning a living as the result of Defendants' alleged actions," given that she has "come forward with no evidence that her earnings were in fact reduced." (Defs.' Mem Supp. at 9.) While there is no direct evidence that Plaintiff's earnings were reduced, it can reasonably be inferred from evidence that after Tania reported Perez's behavior and was no longer assigned to profitable sections and had her most profitable shifts eliminated, that her earnings decreased, constituting an adverse employment action. *See, e.g.,* Saaidi v. CFAS, LLC, ---F. Supp. 2d----, 2010 WL 3724878, * 6 (N.D.N.Y. 2010) (employer's limiting employee's access to certain sales venues and events qualified as adverse employment action because the employee "relied heavily on such access to improve her sales percentages and increase her earnings and earning potential"); *Dawson*

14

*v. Bumble & Bumble*, 246 F. Supp.2d 301, 322 (S.D.N.Y. 2003) ("[A] material decrease in earning potential may qualify as an adverse employment action.").

### ii. *Legitimate non-discriminatory reason and pretext*

Defendants argue that even if Tania suffered adverse employment actions, there were non–discriminatory legitimate reasons for those actions. Specifically, Defendants claim that Tania's hours were reduced because of her requested vacation in August and September 2007. However, this reduction does not account for the reductions in the length of Tania's Thursday and Sunday shifts by three lucrative hours, which Tania did not request, and for which no legitimate, non–discriminatory justifications have been offered, and therefore, Defendants are not entitled to summary judgment on retaliation on this basis.

Defendants claim Tania's reassignment to smaller, slower sections of Three Brothers was to achieve a legitimate business goal: "so she could look after her daughter, whom she had trained, who was new to waitressing and who was not a strong waitress in Tania's own admitted opinion." (Defs.' Mem. Supp. at 15.) Defendants rely on the Second Circuit's summary order in *Pointdujour v. Mount Sinai Hosp.*, 121 Fed App'x 895, 897 (2d Cir. 2005), explaining that "Title VII does not permit courts or juries to second–guess the non–discriminatory means an employer selects to achieve a legitimate business goal" (citing *Dister v. Continental Group, Inc.*, 859 F.2d 1108, 1116 (2d Cir. 1988)). Whether Defendants' reassignment of Tania to the windows on the evening of September 13, 2008 was made to achieve the business goal of ensuring Sabrina's productivity or retaliatorily, Defendants

15

provide no explanation for what Tania describes as their "not allow[ing her] to have any of the three sections in the dining room" at any point after her August 11, 2007 complaint to Teresa, even though she had routinely worked those sections before that date. Although Tania averred that Nick and Teresa would reassign waitresses assigned to busy sections that they could not handle, there is no evidence that Nick or Teresa ever considered Tania incapable of working busy dining room sections after August 11, 2007, particularly since she handled such assignments without any difficulty before her complaints. Thus, if Tania's assertions are credited, reasonable jurors could reasonably find Defendants' proffered reasons pretextual and that retaliation was the real motivation.

    C.    Constructive discharge

Defendants also move for summary judgment as to Tania's allegation that she was constructively discharged.[5] "An employee is constructively discharged when [her] employer, rather than discharging [her] directly, intentionally creates a work atmosphere so intolerable that [s]he is forced to quit involuntarily." *Terry v. Ashcroft*, 336 F.3d 128, 151–52 (2d Cir. 2003). Whether working conditions rise to this level generally depends on two inquiries:

---

[5] Defendants characterize constructive discharge as a retaliatory adverse employment action. Since all of Plaintiffs' Title VII and CFEPA claims incorporate constructive discharge, it is better analyzed as an element of damages, given that it is the composite of all the alleged Title VII and CFEPA violations that is claimed to have created the intolerable atmosphere. *See, e.g.*, *Coffman v. Tracker Marine, L.P.*, 141 F.3d 1241, 1248 (8th Cir. 1998) (where there was sufficient evidence at trial of a Title VII violation but insufficient evidence of constructive discharge, the Eighth Circuit remanded to the district court to determine the amount to reduce the damage award by to reflect the failed constructive discharge claim).

"the employer's intentional conduct and the intolerable level of the work conditions." *Petrosino v. Bell Atl.*, 385 F.3d 210, 229 (2d Cir. 2004). The first inquiry may be satisfied by proof that "employers acted with the specific intent to prompt employees' resignations," and the second inquiry "is assessed objectively by reference to a reasonable person in the employee's position." *Id.* at 229–30.

The Second Circuit has not "expressly insisted on proof of [an employer's] specific intent" to force an employee to quit to demonstrate constructive discharge; rather a plaintiff needs to "at least demonstrate that the employer's actions were 'deliberate' and not merely 'negligent or ineffective.'" *Petrosino*, 385 F.3d at 229–30 (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 74 (2d Cir. 2000)). Therefore, Plaintiffs need only establish for the first part of the constructive–discharge test that there remains a genuine issue of material fact as to whether the Defendants acted deliberately in engaging in conduct that created the workplace conditions at issue. Plaintiffs need not demonstrate that Defendants specifically intended for Tania to quit.

Although there is no evidence of Defendants' specific intent to force Tania to quit, there is evidence that Defendants deliberately engaged in acts that made the workplace intolerable, namely forcing Tania to confront Perez after she complained about his vulgar sexual comments, mocking her, and affirmatively deciding not to investigate or reprimand Perez, who continued to make lewd comments to Plaintiffs with impunity. Therefore, a genuine issue of material fact exists as to whether the Defendants acted deliberately in

17

forcing Tania to confront Perez and deliberately refused to discipline him or prevent him from engaging in further harassment.

The next question is whether the workplace atmosphere created by Defendants' conduct was objectively intolerable. A "constructive discharge claim cannot be proved by demonstrating that an employee is dissatisfied with the work assignments she receives within her job title." *Petrosino*, 385 F.3d at 231. Defendants urge that Tania's reduced hours and section–reassignments would not create an objectively intolerable workplace. However, evidence that Perez was allowed to continue to harass Tania and her daughter despite Defendants' knowledge, that Defendants, owners and management, undertook no effective investigation and refused to take action against Perez, is sufficient for a jury to determine that working conditions were "so difficult or unpleasant that a reasonable person in [Tania's] shoes would have felt compelled to resign." *Whidbee*, 223 F.3d at 73. Thus, summary judgment will be denied as to constructive discharge.

### D. Individual liability

Plaintiffs acknowledge that Title VII does not give rise to a cause of action against the individual Defendants and do not oppose summary judgment as to Nick and Teresa under Title VII in Counts Two and Four. However, as Plaintiffs argue as to Count Three, Conn. Gen. Stat. § 46a-60(a)(4), the Connecticut analogue to Title VII's anti–retaliation provision, makes it unlawful for "any *person* . . . to discharge, expel, or otherwise discriminate against any person because such person has filed a complaint [under the

CFEPA]" (emphasis added). For the purposes of CFEPA, a "person" is defined as "one or more individuals, partnerships." Conn. Gen. Stat. § 46a-51(14). Thus, Defendants Nick and Teresa face individual liability under Conn. Gen. Stat. § 46a-60(a)(4). *Perodeau v. City of Hartford*, 259 Conn. 729, 737–38 (2002) ("[W]e note that when the legislature has intended for the provisions of the Fair Employment Practices Act to apply to persons other than employers, it has made its intention clear. For example, in [the anti–retaliation provision,] § 46a-60(a)(4), . . . by contrast to § 46a-60(a)(1), the legislature specifically referred to persons as well as to employers."); *see also, e.g.*, *DeSouza v. EGL Eagle Global Logistics LP*, 596 F. Supp. 2d 456, 467 & n.8 (D. Conn. 2009) (Conn. Gen. Stat. § 46(a)-60(a)(4) gives rise to individual liability).

Defendants further argue that Nick did not make the schedule or require Tania to switch work sections, and therefore, the Court should grant summary judgment in his favor on the retaliation claims asserted in Count Three. However, Tania's affidavit states that after she complained, "the defendants reduced the hours [she] usually worked," and "the defendants reassigned [her] from the larger, more profitable section of the Diner to a smaller, less profitable section." (Tania Corfey Aff., Ex. 5 to Pls.' Mem. Opp'n at ¶¶ 24, 25.) Tania implicated all Defendants, including Nick, in the purported adverse employment actions, and therefore, summary judgment should be denied as to Nick for Count Three.

19

III. Conclusion

Accordingly, Defendants' [Doc. # 34] Motion for Partial Summary Judgment is GRANTED IN PART, absent objection, as to Tania and Sabrina's Counts Two and Four as to the individual Defendants and DENIED IN PART as to Tania's Counts Three and Four against Three Brothers and Tania and Sabrina's Count Three against Nick and Teresa Kallivrousis.

                                  IT IS SO ORDERED.

                                  /s/
                              Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 15th day of October, 2010.